WILLIAMS ALASKA PETROLEUM, INC. and Williams Energy Marketing and Trading, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 02–705C.

United States Court of Federal Claims.

Oct. 1, 2003.

J. Keith Burt, Mayer, Brown, Rowe & Maw, Washington, D.C., for plaintiffs. Kerry Lynn Edwards, of counsel.

Steven J. Gillingham and Kyle Chadwick, with whom were Assistant Attorney General Robert D. McCallum, Jr. and Director David M. Cohen, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., for defendant. Bernard A. Duval, Howard M. Kaufer, Karen E. Schools, and Donald S. Tracy, Office of General Counsel, Defense Energy Support Center, of counsel.

## OPINION

WIESE, Judge.

This action comes before the court on the parties' cross-motions for partial summary judgment. Plaintiffs, Williams Alaska Petroleum, Inc. and Williams Energy Marketing and Trading, challenge the legality of a market-based pricing mechanism included in a series of fuel supply contracts they entered into with the Department of Defense. Plaintiffs now seek $37 million, plus interest, as the difference between the price they received and the alleged fair market value of the fuel delivered.

The parties have fully briefed this issue, and the court heard oral argument on August 7, 2003. For the reasons set forth below, we conclude that defendant's use of a market-based index was lawful, and accordingly we deny plaintiffs' motion for partial summary

judgment and grant defendant's cross-motion.[1]

## FACTS

The Defense Energy Support Center ("DESC"), a component of the Defense Logistics Agency ("DLA"), is the principal purchaser of military fuels for the Department of Defense. From 1980 to 1999, DESC purchased more than $90 billion worth of military fuel. In the spring and fall of each of those years, DESC conducted two major procurements of military fuel and, depending on demand, awarded as many as 30 contracts in each procurement. DESC purchased as much as $4 billion worth of military fuel annually.

Plaintiffs were among those suppliers to whom DESC awarded such purchase contracts. During the period involved in this litigation (1991 through 1999), plaintiffs supplied the military with approximately 256 million gallons of two naphtha-based jet fuels and a diesel fuel used for ship propulsion. DESC paid plaintiffs approximately $177 million for these supplies.

In its purchase of military fuel, DESC utilized a contract type identified in the Federal Acquisition Regulations ("FAR") as "Fixed–Price contracts with economic price adjustment." 48 C.F.R. (FAR) § 16.203 (1995). Such contracts provide for an adjustable price, i.e., a price that is adjusted upward or downward during the term of the contract based on fluctuations in a supplier's prices or costs. The purpose of this contract type is to allocate between the government and the contractor the risk of the economic uncertainties associated with a long-term contract.

Consistent with this procurement approach, all of the contracts at issue here contained a DESC-drafted economic price adjustment ("EPA") clause.[2] Such clauses require that, for each petroleum product to be supplied, an offeror propose a base price per gallon that DESC in turn uses as a basis for price evaluation. Additionally, DESC provides the offerors with a "reference price," i.e., an average or weighted average price for the particular product, as reported in a commercially available petroleum price publication. Over the course of contract performance, changes in the reference price thus serve as the yardstick for corresponding changes in the base price, i.e., the base price per gallon is periodically adjusted either upward or downward by the exact number of cents (or fractions of a cent) that the published reference price has either risen or fallen since the last price adjustment. By this method, both the suppliers and the government are assured that changes in a product's market price are similarly reflected in the product's contract price.

The contracts awarded to plaintiffs from 1991 to 1994 contained EPA clauses that provided for price adjustments based upon monthly average sales prices of refined petroleum products by region as reported by the Department of Energy in its publication Petroleum Marketing Monthly ("PMM"). The PMM index is compiled from price reports that refiners, such as plaintiffs, are required by law to submit monthly to the Department of Energy. Under the PMM-based EPA clauses in plaintiffs' contracts, plaintiffs' per-gallon prices were adjusted monthly.

DESC's reliance on PMM data as the basis for determining contract price adjustments came under attack in a suit filed in this court in late 1989. In *MAPCO Alaska Petroleum, Inc. v. United States*, 27 Fed.Cl. 405 (1992), a fuel supplier challenged the legality of employing the PMM index on the ground that

---

1. This decision addresses Count I of plaintiffs' complaint, which challenges the legality of market-based pricing mechanisms. Counts II though VII, alleging, respectively, misrepresentation, breach of contract, implied-in-fact contract, failure of consideration and frustration of purpose, mistake, and Fifth Amendment taking, have been reserved for later consideration.

2. DESC's use of EPA clauses dates back to the 1973 oil embargo. At that time, DESC allowed offerors to choose between price adjustments based upon published price indexes of refined products or price adjustments based upon actual crude oil costs. Beginning in the early 1980s, however, DESC began using market-based price indexes exclusively, primarily because the prior practice had made it difficult to compare offers for evaluation purposes.

the FAR required economic price adjustments to be tied either to changes in a contractor's established prices or to changes in a contractor's labor and material costs (as demonstrated by actual costs incurred or as verified by specified cost indexes). The *MAPCO* plaintiff argued that the PMM index fell into neither category but instead represented a compilation of the previous month's petroleum sales data. Accepting that characterization, the *MAPCO* court agreed that such a market-based index failed to meet the FAR's requirement of a price adjustment based on "a contractor's established prices" because the PMM index "is [not] the contractor's, nor does it reflect established prices." *Id.* at 411. The court thus concluded that the EPA clauses' adoption of the PMM index was "plainly inconsistent with the FAR," *id.* at 408, and that the clauses were therefore illegal.

In January 1993, shortly after issuance of the *MAPCO* decision, DESC moved to obtain a deviation from the FAR that would allow its continued use of the PMM index until such time as a permanent deviation could be obtained.[3] In its request, DESC explained:

> The [*MAPCO*] decision involved [DESC's] largest program, the $4 billion per year Bulk Fuel Division. Without an interim deviation authorizing use of ... EPA provisions, [DESC] fuels contracting will be in disarray, forced to use EPA provisions based either on cost of crude oil, which would not be reflective of the market prices of the refined products [DESC] purchases, or on a contractor's own price postings, which may not always be reliable or available.

DLA granted DESC's request for interim authority permitting its continued use of the PMM index as the reference standard for price adjustments. By its terms, however, the authorized deviation applied only to "solicitation DLA600–93–R–0061 and resulting contracts," *i.e.*, the fuel supply contracts entered into in 1993, which included plaintiffs' contract DLA600–93–D–0497.

DESC initiated a second request for deviation in September 1994, this time to permit the use of a widely recognized industry publication, Platts Oilgram Price Report ("Platts"), as the index for contract price adjustments. Use of Platts, a daily publication, in lieu of the PMM index, a quarterly publication, offered the benefit of an EPA index that would allow price adjustments to be made on a more timely basis. DLA granted this second request for deviation in November 1994, but only with respect to its contracts issued under Solicitation No. DLA600–95–R–0061.[4]

As with the first deviation, authorization to use the Platts data in EPA clauses applied only to the solicitation then under consideration and did not provide DESC with permanent authority to employ such indexes in future procurements. Thus, in early 1995, DESC applied for another deviation to cover Solicitation No. SPO600–95–R–0161, pursuant to which plaintiffs were awarded Contract No. SPO600–95–D–0526. DESC simultaneously initiated a request that the substance of this deviation, *i.e.*, the authority to use a market-based index such as Platts in its EPA clauses, be incorporated into the Defense Logistics Acquisition Regulations ("DLAR") as a permanent class deviation.

DLA forwarded DESC's request for a class deviation and permanent coverage in the DLAR to the Defense Acquisition Regulation ("DAR") Council. Concurrently, DLA published the proposed regulatory revision in the Federal Register together with a request for comment. The Federal Register notice explained:

> The proposed DLAR coverage expands the use of EPA based on established prices to encompass industry-wide and geographically based market price references, expands the use of EPA based on indexes to encompass indexes for commercial prod-

---

3. The FAR, together with the various agency regulations that implement and supplement the FAR, set forth the policies and procedures that govern the conduct of federal procurement. Deviations from these specific rules are permitted, but only when such deviations are authorized in accordance with prescribed procedures set forth at FAR subpt. 1.4 (1995).

4. The record is not clear as to whether plaintiffs were issued a contract under this solicitation.

ucts or services which are identical or similar to the end products to be provided under the contract, and authorizes the development and use, subject to established agency review and approval procedures, of clauses using EPA references described above.

60 Fed.Reg. 10,826, 10,826–27 (Feb. 28, 1995).

In early March 1995, DLA granted DESC's request for an individual deviation covering Solicitation No. SPO600–95–R–0161, authorizing the use of Platts as the basis for price adjustments involving contracts awarded thereunder. Later that same year, in October 1995, the Director of Defense Procurement, Office of the Under Secretary of Defense, granted DESC's request for a permanent class deviation for the use of EPA clauses based on "established prices to encompass industry-wide and geographically based market price references." That office also approved inclusion in the DLAR supplement of DESC's proposed regulatory revision describing its market-based EPA clauses.[5]

On the basis of the deviation authority granted DESC in 1995, plaintiffs were awarded five contracts: Contract No. SPO600–95–D–0526, awarded pursuant to the individual deviation authority granted in early March 1995, and Contract Nos. SPO600–96–D–0509, SPO600–97–D–0500, SPO600–98–D–0500, and SPO600–99–D–0536, awarded pursuant to the class deviation authority granted in October 1995.

Beginning in January 2001 and extending over the next twelve months, plaintiffs submitted a series of certified claims to the contracting officer asserting that the EPA clauses contained in their various contracts were illegal. Plaintiffs sought a repricing of the delivered fuels based on their fair market value. On February 28, 2002, the contracting officer entered a final decision denying all of plaintiffs' claims.

Four months later, on June 17, 2002, plaintiffs brought suit in this court. As noted above, although plaintiffs' complaint sets forth seven counts for relief, reasserting the same grounds for relief that were raised before the contracting officer, the motions now before the court have a narrower focus. Specifically, we are asked to rule only on Count I, the core proposition advanced by plaintiffs, that DESC's reliance on a market-based pricing mechanism in its EPA clauses was a violation of law. Consideration of this issue requires our examination of two basic questions: first, whether the FAR permitted the use of published market prices as a reference guide for the adjustment of an individual contractor's prices; and second, whether the various deviations that DESC sought following the adverse decision in *MAPCO* were obtained through procedures that complied with the law. We address these issues below.

## DISCUSSION

### I.

■ We begin our discussion with FAR § 16.203, which authorizes the government's use of "[f]ixed-price contracts with economic price adjustment." Such contracts are intended to permit adjustments in the contract price in response to specified contingencies that may occur during the contract performance period. Pursuant to FAR § 16.203–2, the use of such contracts is restricted to those situations where "(i) there is serious doubt concerning the stability of market or labor conditions that will exist during an extended period of contract performance, and (ii) contingencies that would otherwise be included in the contract price can be identified and covered separately in the contract." In keeping with these limitations, FAR § 16.203–3 provides that the use of such a contract requires a determination by the contracting officer that the contract is necessary "to protect the contractor and the Government against significant fluctuations in labor or material costs or to provide for contract

---

5. The final version of the proposed revision was published in the Federal Register on August 2, 1999, 64 Fed.Reg. 41,834, 41,834–35 (Aug. 2, 1999), and now appears at Defense Logistics Acquisition Directive ("DLAD") subpt. 5416.203 ("Fixed–Price contracts with economic price adjustment") and FAR § 5416.203 (2001).

price adjustment in the event of changes in the contractor's established prices."

Pursuant to the FAR, authorized economic price adjustments are of three general types:

(a) *Adjustments based on established prices.* These price adjustments are based on increases or decreases from an agreed-upon level in published or otherwise established prices of specific items or the contract end items.

(b) *Adjustments based on actual costs of labor or material.* These price adjustments are based on increases or decreases in specified costs of labor or material that the contractor actually experiences during contract performance.

(c) *Adjustments based on cost indexes of labor or material.* These price adjustments are based on increases or decreases in labor or material cost standards or indexes that are specifically identified in the contract.

FAR § 16.203–1. Of these three types of price adjustment mechanisms, only the first—adjustments based on established prices—is of concern here. In plaintiffs' view, the phrase "established prices" refers only to an individual contractor's established prices and not to prices contained in market-based indexes. Because the EPA clauses contained in their contracts were based on market-based indexes,[6] plaintiffs contend that they represent an impermissible departure from the FAR.

To support their position that price adjustments must be based on the contractor's established prices, plaintiffs rely on the Federal Circuit's decision in *Barrett Refining Corp. v. United States,* 242 F.3d 1055 (Fed. Cir.2001). In *Barrett,* the Federal Circuit addressed the question of whether the trial court, having determined that the FAR did not permit DESC's use of a market-based price index to adjust a contractor's established prices, could then go on to provide a substitute pricing mechanism on the basis of an assumed implied-in-fact contract. The ba-

sic question, in other words, was one of jurisdiction: whether the trial court had the power to grant the particular remedy that it had provided. The Federal Circuit answered in the affirmative: "[W]e agree with the Court of Federal Claims' legal conclusion that there was an implied-in-fact promise to pay fair market value and, thus, an implied-in-fact contract." *Id.* at 1060.

In plaintiffs' view, because the Federal Circuit accepted the existence of an implied-in-fact contract, the court necessarily endorsed the underlying liability ruling as well, *i.e.,* that DESC's market-based EPA clause was illegal. The defendant in *Barrett,* however, did not challenge the invalidation of the market-based clause but instead challenged only the court's authority to supply a pricing mechanism to replace it. Thus, the Federal Circuit did not address the issue now before us: whether the incorporation of a market-based index into an EPA clause represents a violation of the FAR.

That fact is what makes the *Barrett* decision inapposite. An opinion of a court of appeals is to be read and understood as resolving only those particular issues that the court was asked to decide. *Webster v. Fall,* 266 U.S. 507, 511, 45 S.Ct. 148, 69 L.Ed. 411 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."); *Rhone Poulenc Agro, S.A. v. DeKalb Genetics Corp.,* 284 F.3d 1323, 1334 (Fed.Cir.2002) (*en banc* order vacating panel decision) ("The en banc court has decided that ... the parties' not having contested the [question at] issue, [the prior case] is not binding authority [on that issue]."). Because the Federal Circuit did not take up the question of whether the FAR permits market-based EPA clauses, we therefore conclude that the issue remains open.

Turning then to plaintiffs' contention that the FAR authorized price adjustments based

---

**6.** As explained above, plaintiffs' price adjustments were initially tied to the PMM index, a market-based, monthly index of actual average selling prices, broken down by state and region, for each of several petroleum products. Begin-

ning in 1995, the price adjustments were based on the Platts index, a daily compilation of spot market prices for refined products and crude oil as recorded on the basis of actual sales in various cities and regions.

on the contractor's established prices and not on market-based prices, we note at the outset that FAR § 16.203–1(a) does not speak in terms of a "contractor's" established prices. Rather, that subsection contemplates price adjustments based on "published or otherwise established prices." Similarly, FAR § 16.203–2, the section that describes the application of contract price adjustment provisions, also makes no mention of a "contractor's" established prices. To the contrary, that section explains that "[p]rice adjustments based on established prices should normally be restricted to industry-wide contingencies." Thus, plaintiffs rely on an argument that the text of the regulation, on its face, does not support.

Plaintiffs argue, however, that the meaning of FAR §§ 16.203–1 and 16.203–2 cannot be gleaned from their plain words alone. Rather, plaintiffs urge the court to read those sections both in keeping with the FAR's limitations provision, FAR § 16.203–3, and in light of the FAR's historical evolution as revealed in the development and text of predecessor regulations. As to the latter point, plaintiffs cite Defense Acquisition Regulation ("DAR") § 3.404–3 (1981) and offer the affidavit of Mr. Hugh E. Witt, a Department of Defense official who played a prominent role in the development and use of price escalation clauses in defense industry contracts.

Plaintiffs' argument begins with FAR § 16.203–3, titled "Limitations." That section provides, in relevant part, that an EPA clause may be used only "to provide for contract price adjustment in the event of *changes in the contractor's established prices* " (emphasis added). Plaintiffs contend that the reference in FAR § 16.203–3 to "the

contractor's established prices" limits the price adjustments contemplated in FAR §§ 16.203–1 and 16.203–2 to a contractor's prices, thereby excluding market-based prices. Plaintiffs maintain, in other words, that where FAR § 16.203–1, titled "Description," speaks in terms of EPA clauses based on "established prices," the intended reference is to a "contractor's" established prices.

Plaintiffs attempt to bolster their interpretation of the FAR with reference to the text of the predecessor regulation, DAR § 3.404–3. In contrast to the structure of the current regulation, the earlier version identified the limitations on the use of EPA clauses—including the limitation to a "contractor's established prices"—in the regulation's introductory text. DAR § 3.404–3(a). The reference to a "contractor's established prices" thus preceded the subsection that identified the three types of economic price adjustments and that included the phrasing "established catalog or market price." Based on this arrangement of text, plaintiffs contend that the word "contractor" was omitted from the description of clause types appearing in DAR § 3.404–3(b) because there was no need to repeat what was otherwise obvious from the language appearing in DAR § 3.404–3(a). Under plaintiffs' reading of the DAR, then, contract price adjustments that were intended to respond to changes in a contractor's established prices contemplated the use of an index limited to such prices. Because the transition from the DAR to the FAR was undertaken as part of an effort to unify and simplify—but not to change—federal procurement regulations,[7] plaintiffs maintain that the intention

---

7. As noted by the court in *MAPCO*, the FAR was the result of an effort, commenced in 1978 under the auspices of the Office of Federal Procurement Policy, to unify and simplify federal procurement regulations. *MAPCO*, 27 Fed.Cl. at 409. That effort, completed in 1983, involved the consolidation of three separate systems of procurement regulations: the Federal Procurement Regulations, the Defense Acquisition Regulations, and the National Aeronautics and Space Administration Regulations. In the Federal Register announcement that accompanied the 1981 publication for comment on a draft of the proposed regulations, the Office of Federal Procurement Policy explained:

The fundamental purposes of the FAR are to reduce proliferation of regulations; to eliminate conflicts and redundancies; and to provide an acquisition regulation that is simple, clear and understandable. The intent is not to create new policy. However, because new policies may arise concurrently with the FAR project, the notice of availability of draft regulations will summarize the section or part available for review and describe any new policies therein.

46 Fed.Reg. 42,303, 42,304 (Aug. 20, 1981). As pointed out in *MAPCO*, the FAR section that governs the present dispute, FAR § 16.203, proposed no new policies.

embodied in the DAR should be preserved in the FAR.

In further support of this reading of the regulations, plaintiffs offer the declaration of Mr. Hugh E. Witt, the Department of Defense official who directed promulgation of the Defense Department circular that established the original regulatory language from which FAR § 16.203 was adopted. In his declaration, Mr. Witt explained:

> Based on my interpretation of [the pertinent Defense Department circular] at the time it was promulgated under my direction, an EPA clause that was based on a price index of contract end items or similar items would have violated [the Defense Department circular] and the policies underlying it. A price index would not have satisfied the requirements of an EPA clause based on established prices, because it would not have been based on the contractor's own prices.

Mr. Witt concluded by noting that "inasmuch as the relevant provisions of FAR subpt. 16.2 are not materially different than the relevant provisions of [the circular], in my opinion [the EPA clauses at issue] violate FAR subpt. 16.2, as well."

Plaintiffs argue that their interpretation of the regulations is additionally supported by FAR § 52.216–2 ("Economic Price Adjustment–Standard Supplies") and FAR § 52.216–3 ("Economic Price Adjustment–Semistandard Supplies"), standard clauses identified by FAR § 16.203–4 for use in those situations where price adjustments based on established prices do not require the use of an agency-prescribed clause. These standard clauses provide for adjustments in a "contractor's applicable established price" and define the term "established price" as a price that "(1) is an established catalog or market price for a commercial item sold in substantial quantities to the general public, and (2) is the net price after applying any standard trade discounts offered by the Contractor." FAR §§ 52.216–2(a) and 52.216–3(a). This definition, plaintiffs maintain, confirms that FAR § 16.203 uses the phrases "established prices" and "contractor's es-

tablished prices" as essentially synonymous terms.

Despite the comprehensiveness of plaintiffs' arguments, however, we are not convinced of their correctness. Regulations, like statutes, are to be read and understood in accordance with the plain meaning of the words they employ, *Whelan v. United States*, 208 Ct.Cl. 688, 529 F.2d 1000, 1002–03 (1976), and "[w]hen the language is plain, we have no right to insert words and phrases, so as to incorporate in the statute a new and distinct provision," *United States v. Temple*, 105 U.S. 97, 98, 17 Ct.Cl. 436, 26 L.Ed. 967 (1881). Plaintiffs' interpretation of the regulation requires the insertion of a word to the text—changing the phrase "[a]djustments based on established prices" to "adjustments based on a *contractor's* established prices"—that is neither necessary to a reasonable reading of the regulation nor essential to the accomplishment of its purpose. In essence then, we are being asked to rewrite the regulation rather than to interpret it.

Even assuming, however, that resort to external sources is appropriate to determine the meaning of the regulation beyond what its words alone would indicate, the sources plaintiffs cite do not support their interpretation. For example, plaintiffs' contention that the word "contractor" was omitted from the text of DAR § 3.404–3(b) because the arrangement of text made its repetition unnecessary and that this omission was carried over in FAR § 16.203–1(a) is a dubious proposition at best. There is no more reason to say that the DAR contains an implicit term than to make that claim about the FAR. In either case, the regulation makes sense as it stands because price adjustments to address changes in a contractor's established prices do not contemplate the use of an index based on the contractor's established prices. Rather, as the regulation indicates, such changes are to be based on a market index, *i.e.*, an index reflecting "increases or decreases from an agreed-upon level in published or otherwise established prices of specific items or the contract end items." FAR § 16.203–1(a). Indeed, if the caveat noted in FAR § 16.203–2 is to be honored—that "[p]rice adjustments based on established prices ... be restricted

to industry-wide contingencies"—then it would seem almost a forgone conclusion that price adjustments must be based on market prices of the same or similar products. Except in instances where the competitive integrity of a contractor's pricing can be independently verified, it is only industry-wide data that can substantiate pricing changes reflective of industry-wide contingencies. In sum, then, our view is that FAR § 16.203 not only permits adjustments to a contractor's established prices to be based on market indexes, but in fact requires it.[8]

The interpretation of the regulations set out in Mr. Witt's declaration does not prompt a different conclusion. Although Mr. Witt clearly played a prominent role in the shaping of federal procurement policy (particularly as it relates to the adoption of EPA clauses), he was not a participant in the drafting of the Defense Department circular from which the present regulations were derived. Rather, as Mr. Witt explained, he "directed promulgation of [the] Defense Department Circular," an activity that "included consultation with [the] Deputy for Procurement Policy, the [Armed Services Procurement Regulation] Committee, and the defense industry." It is from this supervisory vantage point that Mr. Witt spoke. Therefore, what his declaration offers may qualify as an informed opinion—Mr. Witt's "interpretation of [the Defense Department circular] at the time it was promulgated"—but not as a statement reflective of official policy adopted at the time the circular was issued. Such personal views, having no formal agency endorsement, lack the probative weight necessary to establish a meaning for the regulation that its words cannot readily support.

Nor do we believe that the standard adjustment clauses set out at FAR §§ 52.216–2 and 52.216–3 make plaintiffs' case. Although we agree with plaintiffs' contention that the phrase "contractor's ... established price" as used therein equates with the term "es-

tablished price," we cannot accept plaintiffs' broader argument that this identity in usage of terms extends also to FAR § 16.203–1(a)'s reference to "[a]djustments based on established prices." As FAR § 16.203–4 explains, a standard EPA clause may be used when, in addition to meeting other required qualifications, the procurement is "for standard supplies that have an established catalog or market price." As noted previously, an established market price for purposes of a standard EPA clause involves the "market price for a commercial item sold in substantial quantities to the general public." FAR § 52.216–2(a). Where these conditions are satisfied, the government can be assured of the competitive integrity of the contractor's pricing; hence, no index is necessary to substantiate the validity of changes in the contractor's established prices.

The case at hand, however, does not involve a "commercial item sold in substantial quantities to the general public," and hence no sales base exists from which the reasonableness of the price to the government can be confirmed. Instead, this case involves a product of which the government is the chief, if not the only, purchaser. Thus, the term "established price" as defined for purposes of a standard EPA clause simply does not apply in the present context. Rather, for purposes of this case, the term "established price" requires us to look beyond the contractor's own prices to market prices in general. And that broader view, as we explained earlier, is necessary in order to satisfy FAR § 16.203–2's prescription that "[p]rice adjustments based on established prices ... be restricted to industry-wide contingencies."

Having concluded that the use of market-based EPA clauses was a legitimate exercise of DESC's authority, we now turn to plaintiffs' final challenge to the clauses' legality. In plaintiffs' view, DESC's resort to deviations following the *MAPCO* decision was an admission by that agency that the FAR did

---

8. A related view, one also expressing disapproval of *MAPCO*'s conclusion that adjustments to a contractor's established prices require use of an index based on the contractor's established prices, is set out in *Calcasieu Refining Co. v. United States,* No. 02–1219C, 2003 WL 22049528 (Fed.Cl. July 31, 2003). In addressing the differ-

ence in language between FAR § 16.203–3's reference to a "contractor's established prices" and FAR § 16.203–1's reference to "established prices," the court explains that "the purpose of those terms is to define the appropriate type of supply that qualifies for an EPA, not the mechanism for adjusting it." *Id.* at *16 n. 5.

not in fact authorize the type of EPA clauses it had been using. In its initial request for deviation in January 1993, for instance, DESC acknowledged that "[t]he types of EPA provisions specifically authorized by the FAR are not satisfactory alternatives to the market indexes [DESC] utilizes in petroleum contracting." Similarly, in the February 1995 Federal Register notice of the proposed regulatory revision, DESC explained that "[d]eviations were requested because the types of EPA references used in these clause[s] are not specifically recognized under the three general types of EPA references at FAR 16.203." 60 Fed.Reg. 10,826, 10,827 (Feb. 28, 1995).

We do not, however, read DESC's post-*MAPCO* statements concerning the legality of its EPA clauses as a concession of the correctness of the *MAPCO* court's conclusion. Rather, those statements are simply acknowledgments by DESC of the limits of its authority under the FAR as subsequently declared by the court in *MAPCO*. As such, these statements do not reflect DESC's retreat from its prior interpretation of the FAR or its endorsement of a new interpretation; they reflect, instead, the agency's understanding of the *MAPCO* decision. Thus, we accord these statements no probative significance.

## II.

Even were we to endorse the *MAPCO* court's conclusion or attach some significance to DESC's acceptance of it, however, we would still be unable to deem DESC's use of market-based EPA clauses illegal. That is the case, we conclude, because the deviations DESC sought were sufficient to confer on that agency any authority it otherwise lacked. Thus, pursuant to those deviations, market-based indexes were both the legitimate and appropriate measures for adjusting the contract price.

Plaintiffs acknowledge that properly attained deviations would have remedied any defects in DESC's authority to employ a market-based EPA clause. Plaintiffs contend, however, that certain flaws existed in the deviation process that DESC followed, including DESC's application for individual

rather than class deviations in 1993, 1994, and 1995 and DESC's failure to satisfy the requirements for the class deviation sought in 1995. Such defects, in plaintiffs' view, render those deviations a legal nullity.

■ In contemplating the alleged deficiencies in the deviation process, we begin with the premise that the regulations defining that process are essentially housekeeping rules promulgated by the agency to govern its internal procedures. As such, an agency's interpretation of the rules by which it conducts its business should be respected unless plainly inconsistent with the language of the rule. We should not, in other words, be quick to find fault with their application.

■ Even were we to accord no deference to internal agency procedure, however, we would find no violation of the rules governing DESC deviations. We cannot, for instance, accept plaintiffs' argument that the individual deviations in place from 1993 to 1995 applied only to an individual contract action and, as such, could not support the use of market-based EPA clauses in all of the contracts— often as many as 30—that DESC awarded under a single fuel solicitation.

At the time DESC sought the individual deviations in question, FAR § 1.403 (1995) defined such deviations as those that "affect only one contracting action," and FAR § 2.101 (1995) defined the term "contracting" as an activity that included "selection and solicitation of sources [and] preparation and award of contracts." A similarly expansive definition was contained in the supplementary regulations issued by DLA. These regulations, known today as the Defense Logistics Acquisition Directives ("DLAD") and formerly called the Defense Logistics Acquisition Regulations, defined individual deviations as exceptions to the coverage of the FAR and other agency regulations that affect "only one contract *or transaction.*" DLAD 4105.1 § 1.403 (1995) (emphasis added).

Under a reasonable reading of these definitions, then, an individual deviation clearly may extend to a solicitation that encompasses the award of multiple contracts. In fact, the DLA official who approved DESC's request for an individual deviation in January 1993

interpreted the regulatory provisions in exactly this way when he noted in his approval letter that the deviation "applies only to... solicitation DLA600–93–R–0061 and resulting contracts."

Plaintiffs point out, however, that in the current version of the FAR, the term "contracting action" has been shortened to "contract action," FAR § 1.403 (2002), thus reinforcing the view that an individual deviation applies to only one contract. Yet, to the extent that the change was undertaken simply to eliminate inconsistencies in the FAR's use of the terms "contracting action" and "contract action" without accomplishing any change in the term's meaning,[9] we do not see how such a revision can in any way affect the previous definition of the term "contracting action."

Having concluded that the individual deviations sought in 1993, 1994, and 1995 were valid, we turn next to the class deviation sought in 1995. A class deviation, as the term would suggest, is an exception to the FAR that affects "more than one contracting action." FAR § 1.404 (1995). Under DLA regulations, the adoption of a proposed class deviation that is expected to have a significant cost or administrative impact upon contractors or offerors, as is the case here, requires compliance with certain administrative procedures, including publication in the Federal Register. The pertinent regulation reads in part as follows:

> Requests for class deviations which have a significant cost or administrative impact upon contractors or offerors must be published in the Federal Register....
>
> (i) Class deviations for which publication is required should be submitted to [DLA's Office of Procurement] in sufficient time to allow for a 60 day public comment period, resolution of public comments, review of the resolved comments by the DAR Council and approval by the Director, Defense Procurement.

DLAR § 1.490(b) (1995).

In plaintiffs' view, the class deviation sought by DESC authorizing DESC's contin-

ued use of the Platts-based price index for all contracts involving bulk petroleum purchases was defective because it (i) was put into effect without the benefit of public notice and opportunity for comment; (ii) was not approved, as required, by the DAR Council; (iii) was issued without regard to the impact-on-small-business analysis required by the Regulatory Flexibility Act, 5 U.S.C. § 603(a); (iv) expired of its own terms after three years and did not therefore cover the final year at issue; and (v) was not designated as a deviation in the contract as required by the FAR. Plaintiffs contend that these alleged infirmities of process render the class deviation invalid.

Plaintiffs' conclusion, however, does not comport with our understanding of the facts. DESC began its quest for a class deviation in early 1995, with a January 4 letter to DLA's Office of Procurement titled "Request for Class Deviation and Permanent Coverage in DLAR." In that letter, DESC explained that while the individual deviation granted in November 1994 provided the authority necessary to utilize the revised EPA clause in the then-current solicitation, it did not provide DESC "with a permanent means for utilizing the revised ... clause in the bulk petroleum program." DESC went on to request that "the substance of the new deviation be incorporated into the DLAR because the class deviation will be needed beyond the normal three-year expiration period." Accompanying this letter was a memorandum to the DAR Council explaining that because DESC had used the market-based price concept since the early 1980s and found it to be a reliable method of price adjustment, it would be "unnecessary to review the deviation every three years as with most class deviations." The memorandum concluded with a request that "the deviation be made permanent and be included in the DLAR."

Notice of the proposed rule and a request for comment was published in the Federal Register on February 28, 1995. Upon the close of the 60–day comment period, DESC provided the DAR Council with a revised memorandum dated May 12, 1995, address-

---

**9.** The explanation for the change in terms appears in the notice of proposed rule changes

published in the Federal Register, 65 Fed.Reg. 34,894, 34,894 (May 31, 2000).

ing the one public comment that had been received in response to the Federal Register publication. The memorandum noted:

> The National Security Industrial Association [the commentor] is concerned that the EPA references chosen by the contracting officer might not reflect actual market prices and therefore, the price available to the contractor. They stated, "Such a situation could unfairly shift the risk of price uncertainty to the contractor."
>
> [DESC] responds that the commentor seems concerned about implementing the market price concept, not the concept itself. Because [DESC] successfully used the market price EPA concept since the early 1980's, we do not believe that any concern is warranted. None of [DESC's] contractors have filed comments regarding the proposal. In any event, [DESC's] EPA clauses contain provisions for revising market price indicators, if the contracting officer finds a reference has been discontinued, or if it substantially and consistently fails to reflect market conditions.... Accordingly, the comment does not warrant revising the proposed DLAR coverage.

Thereafter, on October 5, 1995, the Director of Defense Procurement, Office of the Under Secretary of Defense, approved DESC's request for a class deviation. The approval memorandum stated in part:

> I approve your request to deviate from the requirements of Federal Acquisition Regulation (FAR) 16.203–1 and 16.203–4(a) when using economic price adjustments on fixed-price contracts.
>
> \*   \*   \*   \*   \*   \*
>
> I authorize you to develop and use economic price adjustment clauses that are

based on (1) established prices to encompass industry-wide and geographically based market price references, and (2) indexes that include commercial products or services which are identical or similar to the end products being obtained. You are also authorized to include the attached language in the Defense Logistics Agency supplement.[10]

DESC operated under the authority of the class deviation until August 2, 1999. On that date, DLA published notice in the Federal Register advising of its adoption of a "final rule," i.e., a new regulation expanding the use of contract clauses concerning economic price adjustments to include indexes based on market prices. See 64 Fed.Reg. 41,834, 41,834–35 (Aug. 2, 1999). The text of the regulation, as adopted, is identical to that initially proposed in 1995 except for the removal of certain language that was rendered inapplicable due to an intervening change in a related procurement statute.[11]

Given the above-described procedural history, we cannot conclude that any of the defects plaintiffs allege—that the notice given for the class deviation was insufficient, that the DAR Council failed to approve the deviation as required by regulation, or that the omission of either an impact-on-small-business analysis or of contractual references to the deviation was fatally prejudicial—have any merit whatsoever. DLA published notice in the Federal Register on February 28, 1995, advising of its intention to expand the FAR to authorize the use of EPA clauses encompassing industry-wide and geographically based market price references. Despite plaintiffs' argument that notice of a proposed permanent change to the FAR is not notice of a temporary change to the FAR

---

10. The "attached language" to which the approval memorandum refers is nearly identical to the language that now appears as part of the regulations issued by DLA in supplementation of the FAR. The current language is codified at FAR § 5416 (2001).

11. The change between the proposed rule and the final rule is explained in the published notice as follows:

> The final rule is the same as the proposed rule with one exception. The second sentence in Subpart 5416.203–4, "Contract clauses" of

the proposed rule, which states that "established prices in such clauses need not be verifiable using the criteria in 48 C.F.R. (FAR) 15.804–3" was removed in the final rule. The criteria referred to were deleted from the Truth in Negotiations Act (TINA) (10 U.S.C. 2306a) when the statute was recently revised. Accordingly, the revised and renumbered FAR Part 15 no longer contains these criteria. Therefore, the language has been removed from the final rule as it is no longer applicable. 64 Fed.Reg. 41,834, 41,835.

(as the first informs the public of a potential but not immediate change in the law, while the second informs the public of an immediate but not permanent change in the law), we do not believe that the combining of procedures that DESC adopted here resulted in a class deviation that was void from the inception.

The proposed class deviation and the proposed permanent change to the FAR were substantively identical and each depended for its authority on the same in-house approval procedures. Given these facts, it is difficult to understand why a difference in the timing of the introduction of these changes is sufficient to set them apart. Clearly, plaintiffs had an opportunity to speak to the merits of the proposal, and plaintiffs make no claim here that their decision not to do so was influenced by the lack of notice that the proposed change would initially be implemented in the form of a class deviation.

Under these circumstances, then, where plaintiffs attribute no injury to the error of which they complain, we must conclude that even if the agency's failure to give notice of the class deviation could be considered error, that error was harmless. In reaching this conclusion, we draw upon analogous case law developed under the Administrative Procedure Act, 5 U.S.C. § 553, which recognizes that "[e]ven where notice and comment were erroneously omitted, a regulation or rule need not be invalidated if it has no substantial impact." *Cabais v. Egger,* 690 F.2d 234, 237 n. 4 (D.C.Cir.1982); *see also First American Discount Corp. v. Commodity Futures Trading Comm'n,* 222 F.3d 1008, 1015 (D.C.Cir.2000) (applying the rule of harmless error to an alleged defect in notice of agency rule making where the claimant suffered no prejudice as a result). Accordingly, we conclude that the class deviation is no less enforceable than the subsequent revision to the FAR.

Nor, as plaintiffs contend, is the class deviation legally defective for want of approval by the DAR Council as required by DLAD 4105.1 § 1.490(b) (1998). As the facts demonstrate, DESC acknowledged throughout the deviation process the necessity for DAR Council participation. Specifically, DESC prepared memoranda regarding the need for the deviation for submission to the DAR Council both at the outset of the process as well as after the conclusion of the public comment period. Although the record does not contain minutes of the DAR Council's deliberations regarding the deviation, one may reasonably assume that such deliberations did occur given the fact that the deviation was ultimately approved by the Director of Defense Procurement—the office that holds the final approval authority in the Department of Defense for all class deviations. Defense Federal Acquisition Regulation Supplement § 201.402(1)(ii). The proper exercise of that final authority demands assurance that the procedures contemplated by the regulations for the processing of class deviations have in fact been followed. Ultimately, then, it is the expectation of the faithful performance of official duties that prompts the court to reject plaintiffs' argument as unfounded speculation.

■ We must similarly reject plaintiffs' contention that the class deviation is rendered invalid in light of DESC's failure to comply with the Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601–612 (2000). The RFA requires that an agency, when it is otherwise required to publish notice of a proposed rule in the Federal Register, also "prepare and make available for public comment an initial regulatory flexibility analysis ... describ[ing] the impact of the proposed rule on small entities." 5 U.S.C. § 603(a). The purpose of the RFA is to ensure that small businesses are not adversely affected by government rules and regulations. S.Rep. No. 96–878, at 1–2 (1980), *reprinted in* 1980 U.S.C.C.A.N. 2788. Only where the "head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities" is this requirement waived. 5 U.S.C. § 605(b). Given this statutory framework, plaintiffs maintain that DESC's failure to perform the initial regulatory analysis required by the RFA resulted in a class deviation that was fatally defective.

The difficulty we have with this argument is that § 611(a)(1) of the RFA limits the right of judicial review to "a small entity that

is adversely affected or aggrieved by final agency action." Plaintiffs are not a small entity, i.e., a small business, nor does their grievance concern a final agency action. (Their argument, as we have noted, concerns DESC's alleged failure to have performed an initial regulatory analysis.) In short, plaintiffs are precluded by the terms of the RFA from contesting DESC's actions.

Plaintiffs attempt to overcome this barrier to judicial review by claiming that their suit "does not challenge DESC's substantive determination" but rather the agency's "absence of compliance with procedural restrictions." Plaintiffs are indeed correct that courts have jurisdiction to review for procedural error agency determinations whose substantive content may otherwise be beyond the reach of judicial scrutiny. See, e.g., Murphy v. United States, 993 F.2d 871, 873 (Fed. Cir.1993) (observing that even "[w]hen the military is given unlimited discretion by Congress, it is nevertheless bound to follow its own procedural regulations if it chooses to implement some"). This distinction, however, cannot be invoked in a situation such as this one where plaintiffs lack the standing necessary to contest the agency's action and where, in addition, the statute reinforces its constraints on judicial review by declaring that "[c]ompliance or noncompliance by an agency with the provisions of this chapter shall be subject to judicial review only in accordance with this section." 5 U.S.C. § 611(c). Accordingly, plaintiffs' challenge to DESC's decision not to perform an initial regulatory flexibility analysis, whether justified or not, is not a matter that can be raised in this litigation.

We also reject plaintiffs' argument that even if the class decision could be considered valid, its enforceability would not have extended to contracts awarded after October 5, 1998, i.e., three years after the promulgation of the October 5, 1995, class deviation.[12] Plaintiffs draw such a conclusion from the text of DLAD 4105.1 § 1.490(a)(i) (1998), which specifies that "[r]equests for new deviations which will be needed beyond the normal three year expiration period should be submitted to [DLA Headquarters] as permanent deviations to be incorporated into the [DLAD]." We do not read this language, however, as limiting the authority established through a class deviation to an absolute period not to exceed three years. Rather, as the words suggest, the purpose of the regulation is to provide guidance to management to process as permanent changes to the agency's procurement regulations those deviations that are expected to extend beyond a three-year period. The regulation, in other words, is an instruction, not a time limitation. DESC followed that instruction.

■ Equally unavailing is plaintiffs' argument that DESC's failure to designate the EPA clauses as deviations within the contract renders those deviations unenforceable. The provisions to which plaintiffs refer are FAR §§ 52.103 and 52.252-5. FAR § 52.103(a) specifies that any FAR provision or clause, whether incorporated by reference or in full text, is to be identified by number, title, and date and if used with an authorized deviation, "the contracting officer shall then insert '(DEVIATION)' after the date." Pursuant to FAR § 52.103(b), a similar requirement is applicable to an agency-drafted provision or clause issued in supplementation of the FAR. FAR § 52.252-5 in turn prescribes the text of the provision that is to be included in a solicitation that contains an authorized deviation from the FAR.[13]

We disagree with plaintiffs' contention that, for lack of proper labeling, DESC's class deviation is without force or effect. The deviation was processed in accordance

---

**12.** Plaintiffs identify Contract No. SPO600–99–D–0536 as the only contract awarded them after October 5, 1998, that would be subject to the "expired" class deviation.

**13.** The clause prescribed by FAR § 52.252–5 reads as follows:

AUTHORIZED DEVIATIONS IN PROVISIONS (APR 1984)

(a) The use in this solicitation of any Federal Acquisition Regulation (48 C.F.R. chapter 1) provision with an authorized deviation is indicated by the addition of (DEVIATION) after the date of the provision.

(b) The use in this solicitation of any [insert regulation name] (48 C.F.R. chapter ___) provision with an authorized deviation is indicated by the addition of (DEVIATION) after the name of the regulation.

with law and therefore stands as a legitimate exercise of administrative authority. This is not to say, however, that DESC's failure to satisfy the requirements of FAR §§ 52.103 and 52.252–5 may pass without consequence. To the contrary, the failure to identify the deviation in the manner required by the FAR can give rise to a claim for relief to the extent that a bidder is able to demonstrate actual prejudice as a result of the lack of the prescribed notice. In this case, then, plaintiffs would have had to show that their understanding of the operation of the EPA clauses set forth in the various solicitations in which they participated would have been different—consequently affecting their bidding practices—had they known the clauses to be deviations from the FAR rather than authorized by the FAR. Plaintiffs have made no such showing. Their contention is simply that DESC's failure to honor the FAR requirements renders the class deviation a legal nullity from the start. That argument we reject.

## CONCLUSION

For the reasons set forth above, we conclude that DESC had the authority to adopt market-based EPA clauses in the petroleum contracts awarded plaintiffs during the years 1993 through 1999. That authority was established by the provisions of FAR § 16.203 as well as by the deviations granted DESC during those years. Accordingly, plaintiffs' motion for partial summary judgment is denied, and defendant's cross-motion is granted.

This decision, however, does not resolve the case in its entirety. There remains to be considered plaintiffs' contention that even if DESC had the authority to use such market-based EPA clauses, these clauses were nevertheless defective because the price index they incorporated failed to ensure payment of the fair market value of the delivered fuel. In support of this argument, plaintiffs rely on various theories of recovery, including misrepresentation, breach of contract, implied-in-fact contract, failure of consideration and frustration of purpose, mistake, and Fifth Amendment taking. The court will consider these remaining issues in the next round of this litigation. At that time, plaintiffs will also be expected to address the question of why their nearly decade-long participation in DESC's annual petroleum procurements should not now preclude them, as a matter of law, from contesting any aspect of the application and operation of the EPA clauses adopted in those procurements.